Good morning, Your Honors. Jason Caruso, on behalf of plaintiffs and appellants Bradley Englebrick and Roxanne Hernandez. I just wanted to anchor the court primarily about what this case is really about. Fundamentally, this case is about a defective gas cylinder that almost killed my clients years ago. What this case, however, turned into at the District Court and all throughout discovery proceedings is nothing more than an inquisition into my clients' personal lives as to the most embarrassing aspects of their sexual practices. Well, except for, I have to say, I've been a judge for a long time and I was a trial attorney, I was a trial judge, all of those. This record of lying is pretty incredible here. So, I mean, that is not the usual lying that you see in a case. I mean, I think, I sort of have felt as judges, I probably hear perjury every day because people say mutually exclusive things or when I was a trial judge. But this was, it went on for a really long time and it's pretty incredible and the meth use is certainly relevant to the device. Well, and I'd like to address that, Your Honor. I mean, it's tragic what happened to your clients, but if your clients were in fact, you know, using meth, but there certainly is a lot of evidence before the district judge when he finally dismisses the case that your client may have been using it for, you know, to smoke meth out of it, left it burning for hours at a time. I mean, it's, and that they smoke meth every day, that they've been doing it for years and there was lots of evidence to that effect and that they probably, that they had told their lawyer, would that be you? That would be my firm, Your Honor, not my personal. All right, well, sometime earlier and then still continued and they were in the middle of the trial when it finally got dismissed, right? Right, that's right, Your Honor, two weeks into trial. How much was left to go, by the way, just out of curiosity? At least another two weeks regarding the defendant's case and the close of the plaintiffs. Regarding the materiality issue, the issue of their drug use fundamentally had no materiality to these proceedings and the court essentially found that. In June 2013, the court entered an order denying an application motion on behalf of Worthington saying, despite my discrediting and disregarding the plaintiff's testimony, the plaintiffs have presented substantial evidence of a defect in the cylinder. Now, court, in this case, is due process and in light of the fact that . . . Are you saying that he could have, the judge could have disbelieved all of that and still have found in your favor? Precisely, Your Honor, and the court intimated that in its order. And this was a non-jury trial? It was, to the bench, Your Honor. And so, what was this evidence? The evidence was days of expert testimony by our expert metallurgist, Dr. Ramesh Kaur, who opined that phosphorus used in the construction of this cylinder essentially leaches into the steel body and causes it to be brittle. Steel, under normal circumstances, should be able to bend and absorb energy, which is what makes steel so strong. These cylinders were made very, very weakly. But was it ever intended to be used as a meth pipe? Very interesting question, Your Honor. An employee of Worthington's said that it was foreseen by him that persons would use cylinders like this, even for the act of using it to use drugs. This was actually a foreseen issue by Worthington, not simply a foreseeable one. And I don't want to take the court's time with the idea of superseding cause and all of that, because I think the issue really is proportionality and materiality, that if the court can look at all the evidence before it and say yes, even setting aside the plaintiff's testimony, I still find substantial evidence. The court has indicated that it can sever apart those issues and still render a verdict. Okay, so sanctions dismissal is the highest sanction. It is. So what sanctions would have – your clients have no money, right? And under this, sanctioning could only be of your clients, right? The sanctions against your law firm are different from the sanctions in the dismissal. Absolutely, Your Honor. The sanctions against my client, the court had many avenues to proceed as far as taking an adverse inference against my clients, as far as misuse to even go that far, to ascribe, you know, I'm just going to say that there's 50-50 liability based on what I've heard so far, even 75% liability. There were $4 million in medical bills. Even a 25% finding of liability against Worthington would have meant something to my clients and was a proportional and available remedy for the court for what happened below. Well, is it supporting – there's something called subordination of perjury, which I'm sure that you've heard of. And, I mean, defense attorneys, particularly in the criminal sense, are very familiar with it. And when they know that their client – if their client has told them that what they said is a lie  and it seems that there was a certain indication that that could be what's going on, why isn't that just – you know, how do you remedy that? Well, regarding the subordination of perjury issue, I would dispute that there's any indication, aside from the accusations of Worthington, that our firm did anything to suborn perjury. Well, but whatever happened in camera, we don't know what that is, right? Counsel went in camera about when learning – you know, when he knew that his client was lying about the meth use. I'm sorry, Your Honor, it never went in camera. It never went in camera? It made the request to go in camera, but ultimately nothing was inquired under camera. Okay, so – The evidentiary hearing happened, and Mr. Ringelbreg and Ms. Hernandez were examined. But then it was sort of aborted that Judge Carney seemed to be – feel like, well, hey, I'm going to – you know, that his dismissal was going to take care of everything, right? Exactly. Because that was just, I've imposed the ultimate, so nothing more can happen. Yes, Your Honor. It was the district court decision that he had rendered the ultimate sanction, and then nothing – no further sanction either of my firm or my clients was appropriate. So you think that's wrong, and then plus you think that they shouldn't be able to go back and get some sanctions against your firm too, right? Separate issues, Your Honor. And as to Worthington's appeal, I do believe that that is a dead issue, that as to our firm, no bad faith was ever intended. To the contrary, and as the district court found, we worked for months to ensure that nothing but the truth was delivered at the district court level, despite everything that happened before. We did our best to ensure that only the truth was given. And eventually it was at the trial. Eventually it was. But not necessarily the full truth, right? I'm sorry, Your Honor? There is only truth, but there's also full truth. They didn't come out and say your clients didn't disclose until they were sort of cornered that they were using this for meth, right? They disclosed everything that they lied about, Your Honor. Did they ever say that they were smoking meth out of this device, cylinder? No, no. They just said they were meth users. They were meth users, and they have continued to maintain, and that has never changed, that they were not using the cylinder to smoke methamphetamine on the day of the incident. And to the contrary, my client would not use meth gas to do this because, as is set forth further in the proceedings below, meth gas is not useful for that purpose. It's a very dirty, burning fuel that wouldn't have made sense to use in that situation anyway. People do a lot of things that don't make sense. You can't, if you've been in a courtroom for a lot of years. Like using meth. Understood, understood, Your Honor, understood. I mean, he did have meth the night before. He admitted to that, right? Yes, in the weekend before. And he said he was still under the influence, didn't he? I was present when that comment was made, and my comments about that are not necessarily evidence, but that comment was essentially made in the heat of the moment. Which comment was made in the heat of the moment? Well, maybe I was under the influence at the time. Was it under the heat of cross-examination, as opposed to the heat of the moment? No, it was the heat of the moment, Your Honor. Well, was he being cross-examined? Yes. Okay. Yes, he was, Your Honor. Given I've just got a slight time left, I would like to address Worthington's appeal. Regarding confidentiality, and I think that this is an important point to make, the state bar, and this is codified in the Business and Professions Code, is that our firm and each of our individual attorneys are required to maintain our client's confidences at every peril to ourselves, and that to the extent that we are going to do anything on behalf of our client, whether it's withdrawing or disclosing confidences, we have to do it to the minimum extent necessary, causing the least prejudice possible. And the fundamental dictate, whether you're looking at the ABA rules, the formal opinions, the state bar formal opinions, whether it's the most current one, 2015-192, is that you act reasonably. It may be the case, but the district court here didn't take up, they thought they were barred from raising the sanctions, so the district court never ruled on this. No, to the contrary. The court indicated to Worthington that it was never barred from considering a motion for sanctions. It was our position that they were barred, which was never taken up by the court, but Worthington was expressly instructed that we have continuing jurisdiction to hear a motion for sanctions. So the district court ruled that this was not sanctionable conduct? Yes, Your Honor. Multiple times. Multiple times. The court went so far as to say, do not address this issue to me anymore. Please see Federal Rule of Civil Procedure Rule 11. But they didn't get to ask any questions or get any information about that, right? They got significant information from our clients and the representations of lawyers from our firm on the record. Well, I guess the whole thing is your client has no money, all right? So the sanctions would be against you, and so even if they can get attorney's fees on this case, they're never going to get a dime out of your client. So sanctions, if, let's say, you should have gotten out of the case a year ago and you continue this and they have to continue, you know, because of the positions that you take, how will they ever be made whole on that? They could certainly be made whole by a credit against the judgment against Worthington, possibly reducing it to nothing, possibly reducing it to a negative number. Well, but you didn't win anything. Oh, that's our position. We certainly could have. And the district court indicated that there was significant evidence, substantial evidence of a defect in this cylinder, which is the controlling issue. Well, the dismissal also cost you counsel fees and whatever costs you laid out. Certainly, but honestly, not even a consideration of ours. Fundamentally, this is about not just vindicating our client's rights. No, I'm talking about in terms of a sanction. In effect, even though not directly, this was costly to you in addition to your clients. More than that, it's the approach that attaches. Because of an arguably meritorious case, according to the judge, even if you set aside the testimony of your clients, there was an arguably meritorious case. Right. I mean, there is a practical sanction against us, if you will, in that respect, which is the difficulty. When he said it was a meritorious case, was that before he heard what he determined to be, I can't believe anything that your clients say. It's in the very same paragraph. So on page 10 of our reply brief to Worthington's appeal, we set forth the paragraph in full. And in the same paragraph, the court indicates, I don't believe a word that the clients are saying. However, there is substantial evidence of a defect in the cylinder, which is why this sanction is so strenuous, so grievous. Thank you. Thank you, Your Honor. Good morning. Good morning. May it please the court, I'm Kathy Huang, attorney for appellees, the Worthington entities. Since the court has a lot of 15 minutes per side, I would like permission to split the 15 minutes with my co-counsel, Mr. Ergo, and I would like to take seven minutes to address responding to plaintiff's appeal from dismissal order. That's all right. Thank you. In deciding plaintiff's appeal from dismissal order, this court only needs to answer one question. Did the district court abuse its discretion by dismissing plaintiff's case when it found that plaintiffs repeatedly, willfully, lied under oath about facts material and central to the pivotal issue in this case? How did the fire happen in plaintiff's bedroom at, say, 6 a.m. in the morning on a Monday morning, such that the district court finds that it is now impossible to believe anything plaintiffs have to say about how the accident happened? Can I tell you something that bothers me about this that relates to the fact that this was a non-jury trial? The judge was free to disregard completely the testimony of the plaintiffs, possibly even believe the opposite of what they said, assuming that there was at least some other evidence. It just seems to me to be strange when the judge recognizes that even if you set aside the plaintiff's testimony, there's a meritorious case, and these people have suffered huge injuries, and essentially a meritorious case is being dismissed by a judge who could have decided against them on the merits if he wanted to, and he's sort of avoiding that merits decision in which he could have found for your client and is imposing what seems to me to be a fairly harsh sanction. It may all be within his discretion. I'm just telling you what bothers me to give you a chance to respond. Okay. I would like to say that in the Ninth Circuit, it's well-founded in the Ninth Circuit to address that very issue in Valley Engineers and in Hazard Bush, that in a situation when the court finds that cannot believe anything they say and that there's no assurance a trial can be a true fact, then a dismissal is warranted. And it is not enough to simply strike plaintiff's testimony, even though the judge is the only trial of fact here, because without plaintiff's testimony as to how the accident happened, how do we know how they were using the product, whether they were using the product in an intended manner, in a reasonably foreseeable way? Well, what was your theory at the time of the incident of what caused the fire? What's your theory? Based on the evidence that Worthington had to painstakingly piece together, the evidence is compelling that at or near the time of the accident, plaintiffs, being hardcore meth addicts, succumbing to their addiction, were using the torch and cylinder to smoke meth. And I'd like to just highlight some of that compelling evidence to show that Worthington's defense... Let me say that's true, but so what? So what? The so what... The question, I think, Judge Callahan asked is, how did the fire start? You can use it to smoke meth. What's your theory about how the fire started? We believe that plaintiffs, under the influence of meth, subjected the torch and cylinder to excessive force, therefore causing this brand new steel cylinder to fracture, and in fact the metal even bent by more than 14 degrees. And this is a concession from their own experimental urges. And according to plaintiffs, they brought in this brand new cylinder into their bedroom... I'm sorry, I missed the details. Or maybe you didn't say them. You say excessive force, what does that mean? They banged it, or they... What kind of force, what are we talking about? How did it happen? Say it in plain English. Okay, Your Honor, because we don't have the true facts of how the accident happened, and because plaintiffs are the only two eyewitnesses to the accident, we don't know exactly how they subjected the cylinder to excessive force. What we do have is basic scientific evidence. The question was, what is your theory about how it happened? That's not a question about facts. That's not a question, you know, what was your theory? What was your client's theory about what happened? How did the cylinder get damaged? Our theory is that, based on scientific evidence, meth has an effect of causing people to be aggravated... Super strong? They can bend metal? Super strong, aggravated, overreact, and because they were under the influence, they subjected the cylinder to excessive force,  he was angry, threw it against the wall, knocked it against his computer desk. Some actions he took subjected this cylinder to force, causing it to fail. Well, you could have asked the defendants whether they did that. If they denied it, the judge was perfectly free to say, I believe the opposite is so. What bothers me is that, and what is an otherwise meritorious case in which he was trying non-jury, in which he could have decided it in your favor based on the disbelief of the plaintiffs, he nevertheless chose to terminate it and dismiss it without deciding it. That's what bothers me. It may still not be an abuse of discretion. I'm just telling you that's what bothers me. In your honor, I'd like to just touch upon the allegation of product defect. Worthington sold more than 21 million of these cylinders. Our incident rate was near zero. It was at .00007%. By all accounts, this was a very durable product. The U.S. Consumer Product Safety Commission even conducted its own testing of the product, dropping it from height as high as 6 feet and 10 feet, and the cylinder stayed intact. Gas was still in the cylinder. Well, that seems to me to be operating against your theory. So if they would have flung it to the ground, let's say, it shouldn't have exploded. And they had their own expert testimony who talked about the defect in the design and manufacture of it. Correct. Earlier you asked about at what stage of the trial was this case terminated, and it was before the defense had the ability to put on any evidence. So the fact that there's this determination that this case is meritorious, that's incorrect. That was never found. The reason it wasn't concluded was because you wanted it to end prematurely. Because they decided to wait until 2 weeks into trial to admit that they had committed perjury from the beginning of the case, a case that spanned 4 years. How did that admission for the moment, assuming the judge disbelieved it, how would it have adversely affected your defense that you were going to put in? For example, how strong this pipe was and what degree of trauma it could sustain. May I have the question again? Yeah, how did it adversely affect your defense? In other words, they admit they lied. So how did it adversely affect the defense you were going to put in? Was, I assume, scientific testimony to support your position. That's correct, Your Honor. So how did their self confess perjury by the time you started the defense case? How would it have prejudiced your defense, particularly if the judge disbelieved them? How would it have prejudiced us going forward? Your defense that you were going to put in. Because fundamentally we have no assurance that they would be telling the truth from that point onward. And in fact, Judge Carney highlighted this in his order. Why a dismissal is the only possible sanction in this case is because there is no assurance, even going forward from time of trial, that we would have a just outcome based on truthful facts. He could disbelieve their testimony. There's never any assurance about it. In a civil case, it's more likely than not. The verdict for a plaintiff could be wrong under that 50.1 to 49.9. I submit that Worthington would be prejudiced because we have no assurance that plaintiffs would ever provide a true account of what they were doing in their bedroom that caused the fire to happen, that caused this product to fail. And without those true facts, how could we possibly have any assurance that a just outcome... But you never have assurances. You know, witnesses say what they say. And then your job is to reflect that. I mean, since when is having an assurance that witnesses are telling the truth a sine qua non of going forward with the case? If that were the case, we'd never have any trials at all. Have you ever been in a trial where you've been absolutely assured that every witness has told the absolute truth? I don't know. I've seen my share of trials, and I don't think I've seen any of those. It's usually a bunch of ambiguities, equivocations, people making U-turns, people misspeaking. That's my experience with trials. Maybe you live in a different world. Your Honor, you're absolutely right. I think at every trial, their witnesses are making embellishment. That may be misremembered details, but this case... Have you ever been to a trial where witnesses have told outright lies? All the witnesses on the other side always tell outright lies, right? This is the way trials are. And your job is to put in evidence and make them eat their words. And this is why we have cross-examination. But, you know, I still haven't gotten an answer, at least not a satisfactory answer to Judge Corwin's question. Why isn't it sufficient if the problem is you have doubts, or the judge has doubts about what the plaintiffs say, why isn't it sufficient to say, okay, I will now disbelieve every word that they have said? So, you know, they can go forward, but let me just tell you, you know, I don't believe a thing they say. Now, you could at that point maybe, at the end of their case, move for a... What do you call it? Directed verdict. Well, I guess it's a directed verdict of your jury, but whatever you call it in a bench trial, where you say, you know, we want, you know, since now, your Honor, you've said their testimony doesn't count for anything, we win as a matter of law because they haven't met their burden. You know, so if their testimony is key to their case, but from what I hear opposing counsel say, says, look, we have experts that said that whatever happened in the bedroom, these cylinders should have been able to withstand whatever force they put on it, even unreasonable force, even slamming around, because sometimes these cylinders, these are the propane, these are cylinders that you, right? Aren't they? They're map gas cylinders, and they're typically used for plumbing purposes. Okay. Plumbing? Correct. Yeah, and sometimes plumbers drop things. Sometimes they have big monkey wrenches that fall on the cylinder. So, you know, they're supposed to take some stress, right? That's right, Your Honor. And, in fact, plaintiffs produce a witness who's an experienced plumber who testified that he's dropped multiple cylinders as high as 12 feet and never has cylinders changed. Well, maybe that shows that this was a defective cylinder. This was one that was defective because it should have been able to take whatever stress two crazed meth heads could do in their bedroom with it. If even a plumber can drop something from 12 feet and it doesn't leak, then maybe the answer is there's really nothing. I mean, never mind whether they're telling the truth or not. Let's assume there are crazed meth heads. What could they do with that cylinder that would cause it to be worse than dropping it for 12 feet? It sounds to me like Judge Carney was just angry at the plaintiffs for lying. I mean, what he, I'm gathering, found that they were lying and probably with good justification. You know, the question we have is, is the fact that the judge is angry at a party for lying enough to preclude recovery without a finding of non-liability? Your Honor, we submit that Judge Carney's well-reasoned decision to dismiss the case is not born out of anger. It's born out of well-reason and well-balancing of the helical factors. I don't blame him for being angry. I don't blame him for being angry. You're sitting there for days and listening. You sort of expect people, if they're going to lie, they're going to do a better job of it. Well, you actually, what's unusual about this is you actually, what's unusual is you had a Perry Mason moment. Yeah, we all, we all, we all, we all. It wasn't just lying, but you had a Perry Mason moment where they confessed on the stand. I don't know whether you remember Perry Mason. I do not, actually, but I understand the analogy. To answer both of your questions, why is it simply not enough to strike or not believe anything Plaintiff say, it's because just as you've touched upon, Plaintiff's own expert opinions are premised on their false testimony. How? Well, if the opinion is the cylinder must have been defective because as Plaintiff said, if fractured upon being dropped onto carpeted floor in less than five feet, then that opinion is necessarily based on false testimony. So, in effect, it is not enough to simply strike their testimony. I don't understand, so they didn't drop it at five feet. I don't quite follow your argument. The argument that these things are normally so strong they could withstand that, this one was defective. Dropping it at five feet is Plaintiff's incredible story of how the accident happened. And you think he dropped it for how many feet? I'm sorry? How many feet would he have had to have dropped it? Approximately five because he said he was holding it right in front of him and I believe Mr. Engelbrecht is approximately five feet ten. Okay, given the size of the room, the height of the room, how much, how far could he have dropped it? Let's say he had sort of flung it up. How far could it have? Most rooms are something less than 12 feet because slab to slab I believe is 12 foot and then you've got your floor and your, I mean, you know, this sort of stand. So you're talking about 10 foot ceiling maybe. You can't drop it much more than 10 feet in a room, right? You know, presumably they don't have concrete on the floor in their bedroom. Anyway, you've eaten into the time. We've eaten into the time of your court counsel. I am. We're seeing his hands. But we'll give you some time. We'll give him some time. I would like to just quickly conclude that. Does the court dismiss the order? You've already taken all his time and more. Okay. Thank you. Your Honor, may I please court Richard Ergo for Appellants of Worthington and Worthington Industries appearing for the sanctions motion. How much blood do you want here? We want our day in court. Judge Carney said at the evidentiary hearing, what's relevant is what did counsel know and when did they know it. And then I'll make findings as to when this should have been disclosed. That's a Watergate moment. Right, right. We never got our day in court on that. What Judge Carney did was rule on the motion to dismiss. No mention at all what's over the sanctions motion. So let's say you had gotten your day. So what would you have found? Let's say you had gotten your day. What would you have shown? I don't know what we would have shown. We would have shown at some point in time, before the trial, plaintiff's counsel was aware that their clients had perjured themselves. And he tried to prevent them from doing it. Well, the testimony is that their client. And that's by inference because you can't, in your view, you can't believe what the clients say about when they told the lawyer. Well, that's all we have. We don't have testimony from counsel as to when they learned it. They're not credible witnesses. But we know they learned it before the trial began. And even if they disclosed it right before trial began, we could have absolved with two weeks of trial. And we could have gone directly to the evidentiary hearing and found out that their testimony, their false testimony, went to the core of the accident, that they didn't just merely drop this from five feet, that the force required to fracture the cylinder would have been taking the cylinder and slamming it down on the ground with all their might. But you said they're going to drop it from 60 feet and it wouldn't. From six feet? No. Sixty. I thought if I heard your co-counsel correctly about what the expert said, it could be dropped or one agency tested it and it could be dropped from 60 feet without a break. Six to ten feet was CPSC's findings. We even stipulated, we proposed that let's have a separate trial. If all you did was drop this from four feet, then we're liable. But they didn't agree to that. But the force, this cylinder bent 14 degrees. That doesn't happen from a drop from four feet. That happens when someone's taking a torch and so on and slamming it against a solid object with all their might. That's how this accident happened. That's our theory of how this accident happened. We would have gotten an evidentiary hearing before the trial ever started and the court would have found out then that there wasn't a thing he could believe about how this incident happened. You would have gotten what kind of evidentiary hearing? Well, we would have completed the evidentiary hearing that we started. We had the evidentiary hearing as to plaintiff's perjury. No, no, I'm sorry. You said if we had found this out before trial, we could have dispensed with the trial and had an evidentiary hearing. Yes. I'm just asking what kind of hearing would that have been. Well, certainly as to plaintiff's perjury. What did plaintiff's perjury go to here? Wait a minute. You're not having a trial. You say instead of having a trial, we've had some other kind of hearing. So why don't you tell me what kind of hearing this would have been? An evidentiary hearing about all the things that plaintiffs committed perjury about as to how this accident happened. When you say evidentiary hearings in the abstract, you say we have an evidentiary hearing on emotions for X or a preliminary injunction. What would this hearing have been? They would have dispensed with the trial, and you've had a hearing instead. Well, if before trial Plaintiff's Counsel had disclosed that their client had committed perjury, the evidentiary hearing would have been as to the scope of their perjury. Committed perjury during discovery? When would they have committed perjury? They committed perjury during discovery, during trial, and during the evidentiary hearing. But you see, you are not listening to yourself. You said we wouldn't have had a trial. So this is before trial. So put your mind, okay, so you can't have a hearing on whether they lied at trial when you have presupposed the absence of a trial. Absolutely. You say absolutely, but you just said trial. I'm asking you a question. I want you to listen to the question and answer it, not just spew words at me. Okay? You say you would not have had a trial. You would have had a hearing. Tell me how this would have come about and what the hearing would have been involved. After Plaintiff's Counsel disclosed that his clients had committed perjury, we would have had a hearing before the court as to the scope of that perjury and all aspects of the case the perjury went to. If he had done this before trial. Yes. We had brought a motion two years before trial to dismiss the case based on perjury. And that was without Plaintiff's concessions that they had committed perjury. The perjury here was so drastic that in our... The trial was already in play when the court was convinced that the perjury had gone to that level, right? The trial had gone two weeks. Two weeks. My understanding is the hearing that you didn't get was that you wanted to go further at that particular time, but the trial had already started. You're saying you could have avoided a trial. I thought that this came to a head when the plaintiffs were on the stand. When Brad Engelbrook was called to the stand... Okay, so the trial was already going, so you couldn't have avoided a trial. That's when he confessed to committing perjury. And that's when the scale tipped for the judge. And that's when the judge, after his testimony concluded, said, we're going to suspend the trial, we're going to have an evidentiary hearing as to the scope of the perjury and as to when counsel learned about the perjury and their obligations to disclose it before they did. So the hearing that you want to reopen, the trial had already started. You're acting like it was before. Oh, no, no, no. Yes, the hearing I want to reopen now is limited as to counsel's role, what they learned and when they learned it. But that was happening after the trial had already started. True, yes. Okay. And what would have been the instances of perjury if you hadn't had a trial? What would have been the evidence? What would have been the instances of perjury? Without a trial, before trial? Well, Mr. Engelbrook said that he didn't realize, he didn't think anybody in the house were meth smokers or took meth. He said that there was no meth paraphernalia in his house. And it turned out that the fire department found a meth pipe on his desk. It turned out that that meth pipe was a friend of his who also lived in the house who asked him to hold the meth pipe because his parole officer was going to come visit him later. That's the beginning of the perjury. More perjury, they testified they weren't habitual users. When we obtained the records from the drug treatment center, the disclosure was in the past 30 days, Ms. Hernandez had taken meth 30 times, 30 days out of the past 30 days, that her preferred method of taking meth was smoking it, that she lived with a person who was a habitual drug or alcohol user. It was impeachment evidence to prove perjury. Yes. But when they admitted it on the stand, that's when it really crystallized. That's when it crystallized in the court's mind, yes. I mean, I think everyone's got that. That's the whole purpose of getting ready for trial is to impeach people. But I would find it very rare that you can bring up all, I have a whole bunch of good impeachment evidence, Judge, so just dismiss it. You know, judges don't regularly make findings of perjury prior to trial. True, but counsel doesn't often disclose that their clients have committed perjury two weeks into trial when they could have disclosed that before the trial even began. And I submit that the ethical duties of lawyers, the inherent duty of candor, and the obligations of attorneys as officers of the court, is that they need to disclose when a client has committed perjury, when they find it out, not years later or months later or even weeks later. You know, Professor Freedman, Monroe Freedman, takes a somewhat different view on this. Well, I'm, you know, reading the California rules and the inherent rules of the duty of candor is that, you know, as quoting from the court in Schaefer that was quoting the Supreme Court, it's appropriate to remind counsel that you have a continuing obligation to inform the court of any development which may conceivably affect the outcome of litigation, and that the system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end. That's all true, but let me tell you what troubles me about this. He had a lawyer who apparently was trying to get his clients to tell the truth, and he was ultimately successful. And he suffered because, assuming the dismissal was proper, there was a dismissal of a case that had merit, according to the judge, notwithstanding his client's perjury, and probably cost him a substantial amount of money. And it seems to me that why isn't that enough? He tried to do the right thing. Well, doing the right thing. To expose your client when you're a lawyer is a difficult thing, and there are arguments, as Monroe Freedman made fairly compelling arguments, that a lawyer shouldn't even have that obligation because it tends to thwart the ability of the client to tell his own lawyer the truth. But in this case, the lawyer did. He did try to get them to tell the truth, and they ultimately did tell the truth. And it cost him, ultimately, the sanction. The direct effect of the dismissal was possibly a substantial amount of money in terms of what the judge said was a meritorious case. The judge never said the case was meritorious. He said there is substantial evidence of a defect. And even if there were a defect, that doesn't mean the defect is the cause of the accident, not when someone so substantially abuses the sonar, subjects it to massive force, that would be unforeseeable to any reasonable person. The judge would have to believe that that happened, and he could have disbelieved it. We went through this with your co-counsel. But back to your question, you're right. Counsel apparently attempted to get the client to tell the truth. The client agreed to tell the truth, at least as to some aspect, and consented to that disclosure. Now the question is, under the duties of candor, when does counsel act? Is it fair? Does it comport with the ideals of fair play in a level playing field to hold on to that information and spring it on to counsel and the court two weeks into a trial? Well, spring it on. I'm sure you were happy to have it sprung. I mean, it's one thing if he hadn't disclosed it altogether. That's another story. My team and I spent hours and hours and hours preparing for this trial. Yeah, I understand that, but I'm not sure that all those I don't want to get into an argument about how you spent time, but you found, it seemed to me, significant evidence rather quickly in terms of the meth pipe, in terms of the records from the rehabilitation center. I think you even had a toxicology report. Look, you have a client with a deep pocket, and so you could go on and on looking for what you already know. Nevertheless, my team spent time trying to prepare for this trial to prove an issue, assertions that they were contending pre-trial that turned out they were going to concede. I could have focused our team's energy on that. We have to move on. Thank you, Your Honor. Thank you, Your Honor. Just briefly, I think you're right, Judge Corman, that there was significant evidence that Worthington could have brought to bear. As far as the hypothetical situation of pre-trial disclosure of all these things that Mr. Engelbrecht had said, let's go to the hypothetical situation where he admits that I happen to be a methamphetamine addict, and I used in the weekend before this fire, and it'd be seriously believed that Worthington wouldn't have done exactly what it would have done as far as discovery. It would have gone to all these doctors, gone to all these records, gone to all these friends, because there's no way Worthington is going to say he told us everything. I trust him now. They don't trust him now. It's just incredible. It's not worthy of belief. So there's no prejudice. Under that factor, under HILACO, I think that that factor weighed against dismissing this case. The materiality issue, I think, is important, Congress versus United States, that if the judge was capable of parsing falsehoods from the other testimony, that it made sense not to dismiss this case and to do something less than dismissal. And that's especially so given that even under California law, if the conduct is criminal when the product fails, that's not a bar to liability. As far as this being a surprise at trial, I would just note for the panel that in November 2011, counsel in open court indicated to Worthington and the court itself, we don't dispute they were using methamphetamine in the weekend before the fire, the two days before the fire, 15 months before trial. So, frankly, Worthington's claims of complete surprise and being bushwhacked, it's an engine with a broken cylinder. Thank you. Thank you.
judges: Korman, Kozinski, Callahan